## 13-1107

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆◆◆

PIGGY PUSHERS, LLC,

*Plaintiff-Appellant,*

—v.—

SKIDDERS FOOTWEAR, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
IN CASE NO. 10-CIV-0644,
JUDGE ROBERT HOLMES BELL.

## BRIEF FOR DEFENDANT-APPELLEE

MORRIS E. COHEN, ESQ.
LEE A. GOLDBERG, ESQ.
GOLDBERG COHEN LLP
1350 Avenue of the Americas, 4th Floor
New York, New York 10019
(646) 380-2087

*Attorneys for Defendant-Appellee*

June 26, 2013

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PIGGY PUSHERS, LLC _____ v. SKIDDERS FOOTWEAR, INC. _____

No. 2013- 1107

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee Skidders Footwear, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Skidders Footwear, Inc.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Skidders Footwear, Inc.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

_____

4. ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Morris E. Cohen (Goldberg Cohen LLP), Lee A. Goldberg (Goldberg Cohen LLP), Benjamin H. Graf (Goldberg Cohen LLP), Limor Wigder (Goldberg Cohen LLP), David B. Sunshine (Cozen O'Connor), Martin G. Raskin (Cozen O'Connor), Steven Underwood (Price, Heneveld, Cooper, Dewitt & Litton LLP).

_____

| 12/26/2012 | /s/ Morris E. Cohen |
| Date | Signature of counsel |
| | Morris E. Cohen |
| | Printed name of counsel |

Please Note: All questions must be answered

cc: _____

124

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

STATEMENT OF RELATED CASES ........................................................................1

STATEMENT OF THE ISSUES.................................................................................1

STATEMENT OF THE CASE.....................................................................................2

STATEMENT OF THE FACTS ..................................................................................3

      A.    The '779 Patent ...............................................................................3
      B.    The Accused Product ......................................................................5
      C.    The District Court's Claim Construction Ruling .............................8
      D.    The District Court's Summary Judgment Ruling .............................9

SUMMARY OF ARGUMENT ..................................................................................11

ARGUMENT .............................................................................................................14

I.       STANDARD OF REVIEW ..............................................................................14

II.      THE PATENTEE HAS ALREADY ADMITTED THAT THE SCOPE
       OF THE '779 PATENT IS EXTREMELY LIMITED.......................................15

      A.    The Patentee Is Bound by Her Representations to the Patent Office,
           Which Defined Her Alleged Invention Very Narrowly...................15

III.    THE ACCUSED PRODUCT CANNOT INFRINGE AS A MATTER
       OF LAW BECAUSE IT IS NOT AN INFANT SOCK – IT IS A SHOE........................17

      A.    The Accused Shoe Product is Significantly Different from an
           Infant Sock.....................................................................................17
      B.    The Preamble "An Infant Sock" is a Claim Limitation ..................22
           1.    The Patentee Only Intended to Encompass Infant Socks
               by the Claim.........................................................................23
           2.    The File Wrapper Further Confirms that the Preamble
               is a Limitation ......................................................................28
           3.    The Claims Must Be Limited to Their Intended Scope .......29
           4.    Piggy Pushers' Post-Allowance Attempt to Broaden the
               Claim in Litigation Would Render the Claim Invalid .........31
      C.    Piggy Pushers Resorts to a Cannibalization of the Accused
           Product To Claim Infringement.....................................................32

i

IV.    UNLIKE THE KNOWN STRUCTURE OF A SOCK, THE ACCUSED
SOCK MEMBER PORTION DOES NOT CONFORM TO THE FOOT ........................34

    A.    The Claims of the '779 Patent are Limited to a Sock Member that
Conforms to the Foot of an Infant Learning to Crawl ......................................35

    B.    The Structure of Skidders Sock Member Cannot Infringe .............................36

        1.    Skidders' Sock Member is Molded Into a Fixed Size
and Shape ........................................................................................36

        2.    The Skidders Sock Member is Fixed in Size Larger
than the Foot of the Infant ................................................................38

    C.    The District Court Recognized that Skidders Does Not Meet
this Requirement ................................................................................................41

    D.    Piggy Pushers' Attempt to Mislead – by Doctoring the Accused
Product –Should be Rejected ...........................................................................42

        1.    Piggy Pushers' Distorts the Product for its Own Ends ........................43

CONCLUSION.............................................................................................................47

# TABLE OF AUTHORITIES

## CASES

*United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966)......................27

*Catalina Marketing International, Inc. v. Coolsavings.com,*

    *Inc.,* 289 F.3d 801 (Fed. Cir. 2002).........................................................................23, 29

*Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448 (Fed. Cir. 1998) .....................................14

*Flex-Ability Concepts, LLC v. Radius Track Corp..,* 2009 U.S. Dist.

    LEXIS 28424 (W.D. Okla. 2009) .....................................................................................44

*In re Fout,* 675 F.2d 297 (CCPA 1982) ..............................................................................27

*In re Gurley,* 27 F.3d 551 (Fed. Cir. 1994)..........................................................................25

*Innovention Toys, LLC v. MGA Entertainment, Inc.,* 637 F.3d 1314

    (Fed. Cir. 2011) .........................................................................................................14, 15

*Markman v. Westview Instruments,* 517 U.S. 370 (1996) ...................................................27

*Piggy Pushers, LLC v. Skidders Footwear, Inc.,* 2012 U.S. Dist.

    LEXIS 28470 (W.D. Mich. 2012).......................................................................................2

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298 (Fed. Cir. 1999) ...................23

*Poly-America, L.P., v. GSE Lining Technology, Inc..,* 383 F.3d 1303

    (Fed. Cir. 2004) .........................................................................................................23, 24

*SciMed Life Systems., Inc. v. Advanced Cardiovascular Systems.,*

    *Inc.,* 242 F.3d 1337 (Fed. Cir. 2001).............................................................................27

*SmithKline Beecham Corp. v. Apotex Corp.,* 439 F.3d 1312

    (Fed. Cir. 2006) .........................................................................................................15, 36

*Springs Window Fashions LP v. Novo Indus., L.P.,* 323 F.3d 989 (Fed. Cir. 2003)..……17

*Std. Oil Company v. American Cyanamid Company,* 774 F.2d 448 (Fed. Cir. 1985)......16

*U.S. Philips Corp. v. Iwasaki Elec. Co.,* 505 F.3d 1371 (Fed. Cir. 2007) ...................14, 36

*Vizio, Inc. v. International Trade Commission,* 605 F.3d 1330 (Fed. Cir. 2010).............23

**STATUTES**

Fed. R. Civ. P. 41 ...........................................................................................................2

Fed. R. Civ. P. 56(a) .....................................................................................................14

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Defendant-Appellee states that no other appeal from the same civil action or proceeding in the lower court has previously been before this or any other appellate court. In addition, there are no pending cases known to counsel that would directly affect or be affected by this Court's decision in the pending appeal.

# STATEMENT OF THE ISSUES

1. Whether the district court correctly held that an infringement analysis must be based on the commercial version of the product actually made and sold by the Defendant, and not based on the modified version created by the Plaintiff.

2. Whether the district court correctly held that a patent narrowly limited during prosecution and in the specification, to infant socks only, cannot legally cover an accused shoe having an insole and thick outsole, particularly when the patentee averred in the file wrapper that its infant sock claims are so narrow that they do not even cover a stocking.

3. Whether the district court correctly held that claims to an infant sock requiring a sock member that conforms to an infant's foot, cannot be

legally met by a fabric component molded to a fixed size and shape
that is larger than an infant's foot and accommodates an insole.

## STATEMENT OF THE CASE

This is a patent infringement action brought by Plaintiff-Appellant
Piggy Pushers ("PP"), the owner of U.S. Patent No. 6,385,779 ("the '779
patent") against Defendant-Appellee Skidders Footwear, Inc. ("Skidders").
(A36- A39). In response, Skidders counterclaimed that the patent is invalid
and not infringed. (A48- A54).

The district court issued a Markman Order construing the claims of
the '779 patent in an Opinion and Order dated March 5, 2012. *Piggy
Pushers, LLC v. Skidders Footwear, Inc.*, 2012 U.S. Dist. LEXIS 28470
(W.D. Mich. 2012). (A298- A310; A311- A312). Skidders subsequently
brought a motion for summary judgment for non-infringement based on the
narrow scope of the patent and the absence of numerous claimed limitations
from its accused product. (A313- A341). In an Opinion dated November 2,
2012, the district court concluded that no reasonable juror could find that the
patent is infringed, and entered a judgment of non-infringement in favor of
Skidders. *Piggy Pushers, LLC v. Skidders Footwear, Inc.,* 2012 U.S. Dist.
LEXIS 157339 (W.D. Mich. 2012). (A9- A20 at A20).

The parties then stipulated that Skidders' counterclaim of invalidity
would be dismissed without prejudice pursuant to Fed. R. Civ. P. 41, which

was entered by the Court. (A512-513). A notice of appeal was then filed

by Piggy Pushers on November 14, 2012. (A514- A515).

## STATEMENT OF THE FACTS

### A.    The '779 Patent

Plaintiff-Appellant Piggy Pushers ("PP") is the owner of U.S. Patent

No. 6,385,779. The '779 patent is entitled "Infant Sock." It contains 13

claims – all of them directed to an "infant sock."[1] The preamble of both

independent claims recites, "[a]n infant sock for crawling infants." (A41-

A46 at 4:14, 5:4). According to the '779 patent specification, "the present

invention relates generally to a sock for an infant and, in particular, to a sock

designed to provide additional traction for a crawling infant." (A41- A46 at

1:10- 12).

In each claim, the infant sock is recited in the body of the claim to

include a "sock member" and a "gripper member." (A41- A46 at 4:14, 4:19;

4:56, 4:61). The gripper member is shown in the figures as a thin pad (12)

adhered to the sock member (A41- A46 at Figs. 1-2; 2:55-56) or as a series

of spaced ribs (112) each adhered to the sock member (A41- A46 at Fig. 3;

3: 39-43).

---

[1] The '779 patent claims at issue in this lawsuit are claims 1, 3, 5-8, 10, 11
and 13. Of these, claims 1 and 13 are independent and claims 3, 5-8, 10 and
11 are dependent.

The specification explains the purpose of the invention, indicating the various advantages of fabric socks, such as the fact that they are aesthetically pleasing and keep the infant's feet warm. It then defines the particular problem the patent is intended to solve, namely, that socks can be disadvantageous on smooth floor surfaces because the infant may slip and fall. (A41- A46 at 1:13-22).

As the patent recognizes, one solution to avoid slipping is to just dress the infant with shoes. (A41- A46 at 1: 22-25). However, the patent rejects that solution since "it is not always desirable, and is often difficult, to put shoes on an ambulatory infant." (A41- A46 at 1: 24-25). As such, the patent specifically indicates that it does not intend to cover shoes.

During prosecution, the application was rejected based on the Douglass patent from 1882, U.S. Patent No. 266,614 ("Douglass"). (A487- A489). Douglass discloses a stocking with a coating of India rubber on the bottom. (A487- A489 at 1: 46-49). It discloses a "sock member" in the form of a textile or woven fabric (A487- A489 at 2: 88; Figs. 1-2), with a "gripper member" in the form of a rubber sole or bottom (A487- A489 at 2: 91-92; Figs. 1-2), with the rubber extending up over the toe (A487- A489 at 2: 92-93; Figs. 1-2). As such, Douglass is extremely similar to, if not the same as, patentee's design.

4

In response, Applicant filed an Amendment dated November 25, 2001. In the Amendment, the Applicant argued that "[T]he Douglass [prior art] patent fails to show or teach several limitations of the claimed invention. **The Douglass patent is directed to <u>bathing stockings</u> worn by persons who can walk and does not show <u>an infant sock</u> suitable for crawling infants as claimed**." (A487- A489) (emphasis added).

In other words, Applicant explicitly distinguished over the prior art using the preamble of the claims at issue, confirming that the "infant sock" preamble was intended as a limitation. Applicant also confirmed a narrow scope was intended for the claim, indicating that the scope of "infant sock" was not even intended to cover Douglass' woven fabric product with an all rubber sole.

## B. The Accused Product

The accused product is a shoe, not a sock. As a result, the district court found that "[n]o reasonable juror could conclude that the Accused Product is a sock as defined in the patent. On that basis alone, Defendant is entitled to summary judgment." (A17).

As grounds for its decision, the district court referenced the fact that the Accused Product does not have the characteristics of a sock; rather, it has all the characteristics of a shoe. The product has a separate insole. Socks do not have an insole. It is designed for use in the outdoor environments to

guard the foot against sharp objects and rough surfaces. Socks are not generally designed to be worn outdoors without additional protection. It is configured so that one cannot wear it within a shoe. A sock is made to be worn within a shoe.

The accused product also has a relatively fixed interior size and shape. This is also not characteristic of a sock – it is characteristic of a shoe. A sock is designed to stretch when placed on the foot. Children grow out of the Accused Product quickly because of its fixed size. The Accused Product is accordingly offered in a variety of sizes that match shoe sizes for children 12 months, 18 months and 24 months. Because socks stretch and conform to the foot, they can accommodate a much wider range of foot sizes. One sock, for example, can accommodate all three of those shoe sizes from 12-24 months.

The Accused Product also has a thick, durable outsole. Socks do not have a thick, durable outsole.

All of the above facts were supported by Skidders' expert, Caroline de Baere, a shoe expert with other 20 years of experience in the industry, and Michael Matalon, President of Skidders. Moreover, none of these facts were disputed by Piggy Pusher's expert, Raymond Tonkel. Thus, Skidders' factual support for its motion for summary judgment was unrebutted.

6

In addition, it is revealing that U.S. Customs classifies the Accused Product as a shoe, not a sock. As a result, Appellee Skidders must pay the higher duty rate of 48% for a shoe as opposed to the much lower 8.1% duty rate applicable to cotton socks, or the 16% duty rate applicable to synthetic socks. (A349 at para. 16).

Moreover, while socks are known to fit an infants' foot by conforming thereto, the Accused Products cannot. (A345 at para. 19). As shoes, the Accused Product is designed to maintain a fixed shape and size. This is unlike a sock, but is well known in the field of shoes. (A345 at para. 20). Unlike a sock, when a child's foot is placed inside, the lower sock member does not conform itself to the child's foot. (A345 at para. 19; A352- A353). Also unlike a sock, the toe surface also does not conform itself to the foot either. (A345 at para. 19; A352- A353). [2]

Moreover, the Accused Product, as is the case with shoes, is larger than the foot of the wearer. (A350 at para. 19). It has a fixed in shape and size outsole. It also has a fixed in shape and size interior which is designed to be wider and longer than the infant's foot. (A345 at para. 20; A349 at para. 13). As the Accused Product's interior is fixed in shape and size, it

---

[2] In fact, the Accused Product is sold in a pair, one is specifically identified for use with the right foot and one is specifically identified for the left foot. (A344- A345 at para. 17, 19; A349 at para. 15). If the sock member conformed to the foot, there would be no need for the right/left designation.

cannot conform its size to the wearer's foot. (A345 at para. 19). The interior size and shape stay the same regardless of the wearer. (A346 at para. 23). Thus, the parent has to purchase a product – of fixed size – that matches the child's size. (A350 at paras. 20, 21). If the child's size is off, the parent must get a different sized shoe. (A350 at para. 21). Due to the molding of the rubber outsole to the inner fabric, the accused product is not able to conform to the size of the child's foot, and children can therefore grow out of them quickly. (A350 at para. 21; A345 at para. 21).

In addition, the Accused Product has an insole, totally unlike a sock or the fitting of a sock to the foot. (A350 at para. 9). With an insole inside the Accused Product, the fabric or sock member portion cannot conform to the child's foot. Rather, it must be sized larger than the foot so as to accommodate both the foot and the insole. (A349 at para. 9; A352- A353; A346 at para. 22).

### C.    The District Court's Claim Construction Ruling

For reasons set forth more explicitly below, the district court construed the term "sock," that appears in the preamble of the independent claims, to be "a knitted or woven covering for the foot." The court ruled that the preamble reciting a sock was a limitation of the claim, indicating that the entire record confirmed a sock was intended by the patentee to be a fundamental characteristic of the invention. As such, " the preamble gives

meaning to the claim and is used to define the subject matter of the claim, rather than to merely state a purpose or intended use for the invention." (A303). The court likewise ruled that the patent was not meant to cover shoes; as the district aptly put it, "the Background specifically distinguishes the invention from shoes." (A303 at Fn. 1).

The district court construed "sock member" as "a part of the sock" (i.e., a knitted or woven covering for the foot). The district court also concluded that a "sock member sized to fit a foot" should be construed as "a sock member of a size such that it conforms to the foot (of an infant learning to crawl)." (A307).

## D.    The District Court's Summary Judgment Ruling

The district court rightfully granted summary judgment of non-infringement in favor of Skidders "[b]ecause the Accused Product is not a sock, and, independently and alternatively, because the Accused Product does not conform to the foot of an infant learning to crawl." (A20).

The district court found that "[t]he evidence, viewed in the light most favorable to the Plaintiff, shows at best that the allegedly infringing product is a hybrid shoe/sock. The '779 patent, however, does not apply to hybrid shoe/socks. It applies to a sock. No reasonable juror could conclude that the Accused Product is a sock as defined in the patent." (A17). In construing the claims, the court also took note of Defendant's invalidity contentions

that "if the '779 patent is construed in such a way that it is broad enough to cover the Accused Product, then it follows that Douglass would invalidate the '779 patent.  Likewise, if the Douglass stocking is outside the scope of the claim, then the Accused Product is also outside the claim."  (A17).

The court also rejected the tortured attempt to prove infringement conducted by Piggy Pusher's expert, Raymond Tonkel.  It found that "by destroying the Accused Product, and separating the sock member from the outsole, Tonkel's opinion misrepresents the manner in which the accused product is manufactured, sold and used."  (A15).  "Tonkel's opinion does not create a material issue of fact for the trial as to whether the Accused Product is a sock."  (A16).  In fact, the district court found that "[t]here is simply no evidence from which a reasonable jury could conclude that the Defendant's [Skidder's] product is a sock."  (A16).

In its summary judgment motion, the court also found that the accused product does not meet the claim limitation that it "conform to the foot of an infant learning to crawl."  In its opinion, the district court found that the Accused Product had a "fixed-in-shape outsole and interior which is designed to be wider and longer than the wearer's foot.  These features prevent the Accused Product from conforming to the wearer's foot."  (A18).

In its summary judgment papers, Piggy Pushers had presented the opinion of its expert, Raymond Tonkel, that the Accused Product does

10

conform to the foot because when the sock member of the Accused Product

is "disconnected" from the gripper member, the toe and bottom surface of

the sock member conform to the infant's foot. (A389). Regarding Mr.

Tonkel's opinion, the district court stated that "Tonkel's showing that the

sock member of the Accused Product, when detached from the outsole or

gripper member, conforms to the foot is irrelevant. Tonkel had to destroy

the Accused Product in order to separate the sock form the rubber outsole. It

is not proper to consider the attributes of the sock member separately from

the gripper member. The patent addresses one item, a sock, that is

comprised of both a sock member and a gripper member. By taking the sock

apart from the rubber sole, the expert was not considering the accused

product, but a separate product, a cannibalization of the Accused Product."

(A19).

## SUMMARY OF ARGUMENT

As the District Court correctly stated in granting Skidder's summary

judgment motion, "[n]o reasonable juror could conclude that the Accused

Product is a sock as defined in the patent." (A16). To state, as Piggy

Pushers does, that the '779 patent broadly "covers **any product** comprising

a sock member sized to fit a foot of an infant learning to crawl where that

sock member is connected to a gripper member" is baseless. (Appellant's

Brief at 4) (emphasis added). There can be no doubt that '779 patent and its

claims are directed to an "infant sock." All the claims use this term. (A41-A46 at 4:14, 29, 31, 33…). All parts of the specification solely discuss an "infant sock." (A41- A46 at 1:10, 51; 2:39). All the figures show a sock. (A41- A46 at !41- A43). When discussing the invention[3] in the '779 patent, there is not even a reference to "any product" other than a sock. (A41- A46 at 1:1- 2:22). The prosecution history confirms that the claimed invention is only directed to a sock. In short, the entire specification and the prosecution history confirm that the patent was directed to a product which as a whole is an infant sock. It was not intended to cover a shoe, or even a stocking.

The term "sock" gives meaning, life and vitality to the claim. "It is used to define the subject matter of the claim, rather than to merely state a purpose or intended use for the invention." For that reason and those set forth more explicitly below, the district court correctly construed the term "sock" in granting Skidder's summary judgment motion in its favor.

Indeed, if the patent were construed as broadly as Plaintiff attempts, it would be necessarily invalid over Douglass. Douglass disclosed a product in the form of a woven fabric with a rubber sole. The rubber in Douglas covers the bottom, and then comes up over the toe to cover a portion of the

---

[3] In the underlying action, Defendant also had a cause of action for invalidity of the '779 Patent. Upon entry of the non-infringement judgment, that portion of the case was dismissed on consent of both parties, without prejudice.

upper surface.  (A487- A489) .  The Douglass product can also, of course, be sized for any age person.  As such, Piggy Pushers cannot maintain that it is entitled to protection to all woven fabrics ("sock members") having rubber on the bottom ("gripper members") coming up over the toe to the top surface.   It is limited to a product which, overall, is an infant sock, as disclosed in its specification and averred in prosecution, if even that is patentable (which is highly unlikely).  The patent certainly doesn't cover a shoe with a thick outsole – it allegedly doesn't even cover the Douglass stocking.

Indeed, Piggy Pushers presented no evidence to the district court that the manufactured and sold form of the Accused Product is a "sock."   On the contrary, the undisputed facts all confirmed that the product has the characteristics of a shoe.  Therefore, knowing that it could not prove infringement of the actual Accused Product, Piggy Pushers resorted to mutilating the product and to applying the claim to the mutilated version.  To that end, Piggy Pushers' expert separated the Accused Product in an effort to show that the disconnected element of the product is a "sock" as that term is defined by the '779 patent.

Piggy Pushers also relied on this wrongful cannibalization analysis in an attempt to prove that the Accused Product conforms to the foot.  As the district court stated, Piggy Pusher's analysis is irrelevant because it does not

13

use the commercial Accused Product as it is manufactured, used or sold. Because Piggy Pushers did not and could not provide evidence of infringement of the '779 patent by the Accused Product as a whole, as actually made and sold, the district court found that "Plaintiff has not met its burden of showing that every limitation of the '779 patent is found in the Accused Product." (A20). Nothing has changed in this regard, and the district court's granting of Skidders' summary judgment motion should be affirmed in all respects.

## ARGUMENT

## I.    STANDARD OF REVIEW

Claim construction is reviewed *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*). With respect to infringement, "[t]his court reviews a district court's decision on summary judgment *de novo*, reapplying the same standard applied by the district court." *Innovention Toys, LLC v. MGA Entm't, Inc.,* 637 F.3d 1314, 1318 (Fed. Cir. 2011). "Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id., citing,* Fed. R. Civ. P. 56(a).

In addition, any arguments not raised in the Appellant's opening brief are waived. *U.S. Philips Corp. v. Iwasaki Elec. Co.,* 505 F.3d 1371, 1377

(Fed. Cir. 2007); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d

1312, 1319 (Fed. Cir. 2006).

## II. THE PATENTEE HAS ALREADY ADMITTED THAT THE SCOPE OF THE '779 PATENT IS EXTREMELY LIMITED

### A. The Patentee Is Bound by Her Representations to the Patent Office, Which Defined Her Alleged Invention Very Narrowly

In the Patent Office, the Examiner initially rejected all of the claims of

the patentee's patent application (A480-A486) based on the Douglass patent,

stating that "Douglass discloses the invention substantially as claimed."



*The Douglas Patent*

(A483; A487-A489).

In response, the patentee argued that the Douglass patent is directed to **_bathing stockings_** and does **_not_** show the claimed "infant socks." (A494). The patentee specifically distinguished stockings as being outside the scope of the infant socks of her alleged invention. She attempted to so distinguish even though Douglass specifically explained that his "stocking" was made of woven fabric (A487- A489 at 2:88)– which is the same material as used in a sock.

If something as close as Douglass' stocking does **_not_** fall within the scope of the claims to a sock, then something as far away as Skidders' accused shoe product certainly does not fall within the scope of the claims either. As a matter of law, the strict limitation of the patent-in-suit to infant socks (with no scope at all even to stockings), indicates that the patent may not cover something as different from a traditional infant sock as the accused Skidders shoe. To the extent Piggy Pushers now maintains the contrary, its current position is completely inconsistent with the position that it took before the U.S. Patent Office during prosecution.

As this Court has explained, "the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Std. Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448,

16

452 (Fed. Cir. 1985). "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent. A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement." *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989 (Fed. Cir. 2003).

A patentee is limited by its representations to the Patent Office. It may not later enlarge the scope of the patent in contrary fashion as the patentee is trying to enlarge here.

## III. THE ACCUSED PRODUCT CANNOT INFRINGE AS A MATTER OF LAW BECAUSE IT IS NOT AN INFANT SOCK – IT IS A SHOE

### A. *The Accused Shoe Product is Significantly Different from an Infant Sock*

The undisputed facts in the district court indicated that the accused product has the well-known characteristics of a shoe, but does not have the characteristics of an infant sock. Although Skidders' product has a fabric portion to it, many shoes do. The addition of fabric to the product does not make it a sock, or change the undisputed facts that it is significantly different from a sock.

The following are the undisputed facts regarding the characteristics of the accused product.  ***All of them*** are common to a shoe but not to a sock.

(1)    The accused product has a separate insole.  (A349 at para. 9; A352-A353).  It is a matter of common knowledge that socks never have separate insoles.  (A378 at para. 11).  The presence of an insole is characteristic of a shoe, but never of a sock.  (A380 at para. 22).

(2)    The accused product is designed for use in outdoor environments to guard the foot against sharp objects and rough surfaces. (A349; A352-A353).  Considering the fact that the product is to be worn by young children, this distinction between socks and shoes is revealing. Parents do not want their young children walking in socks outdoors where those children can walk on objects such as broken glass, and so forth. (A344 at para. 12).  For a child to walk outside in shoes, on the other hand, whether on rough surfaces, or otherwise, is totally acceptable.  (A344 at para. 12). Here, the accused product is specifically designed and meant to be worn by a child outdoors without the need for additional foot protection.  (A344 at para. 12; A349 at para.10).  This again, is specifically characteristic of a shoe, not a sock.  (A344 at para. 12).

(3)    The accused product is configured such that it cannot be worn within a shoe.  (A344 at para. 13; A349 at para. 11; A352-A353).  If the accused product were a sock, it would be designed to be worn within a shoe,

18

and possible to wear it within a shoe.  (A344 at para. 13).  That socks are designed so that they can also be worn inside shoes is well known, and simply not possible with the accused product.

(4)　　Similarly, one cannot take one accused product and wear it inside another accused product. (A344 at para. 14; A349 at para. 12, A352-A353).  In contrast, socks are designed such that one can take a pair of socks, and wear one sock within another.  (A344 at para. 14).  This is a fairly common practice for warmth in very cold environments. (A344 at para. 14).  The nature of knitted and woven coverings for the foot allows this practice. (A344 at para. 14).  This characteristic again demonstrates that the accused product is a shoe, not a sock.

(5)　　The accused product has a relatively fixed interior size and shape.  (A344 at para. 15; A349 at para. 13; A352-A353).  This is also characteristic of a shoe.  (A344 at para. 15).

The interior size and shape of a sock is not fixed; rather, it stretches and expands in size to fit onto a foot.  (A344 at para. 15).  This is a very well-known difference between shoes and socks.

(6)　　The accused product has a thick, durable outsole.  (A344 at para. 16; A349 at para. 14.; A352-A353).  This is also characteristic of shoes, not socks.  (A344 at para. 16).  Socks do not have thick outsoles. (A344 at para. 16).  Even the '779 patent which talks about use of a gripper

member never discusses an outsole.  (A344 at para. 16; A361-A366; A352-A353).

(7)     Indeed, when the accused products are imported into the United States, U.S. Customs does not classify them as a sock.  It classifies them as shoes.  As a result, Skidders must pay a 48% duty rate for its shoes, as opposed to the much lower 13-15% duty rate applicable to socks.[4]  (A349 at para. 16).

All of these facts were undisputed by Piggy Pushers in the district court.  They all repeatedly confirm that the accused product does not fall within the narrowly intended scope of the term infant sock that was intended by the patentee and represented to the Patent Office.

Indeed, Plaintiff's commercial embodiment further confirms this:

---

[4] Skidders' advertising serves further to confirm the undeniable reality that the accused product is a shoe.  Skidders has always and only ever marketed and sold the accused product as a shoe.  (A349-A350 at paras. 17-18; A358).  It has never marketed, advertised, promoted, or sold the product as a sock.  Even the packaging of the accused product clearly identifies the product as a shoe.  (A349-A350 at para. 17; A352-A353).



(A356-A357; A349 at para. 6).

That commercial product illustrates what the characteristics of a sock are like. Indeed, in stark contrast to Skidders' product, Plaintiff's commercial product fulfills all of the characteristics of socks and none of the characteristics of a shoe set forth above.[5] Its thin white pads on the bottom further confirm what the patentee intended by her "gripper members." Moreover, although a patent is not limited to its commercial embodiments, the commercial embodiment is fully consistent with the patent's

---

[5] For an infringement analysis, of course, it is only a comparison of the accused product to the patent claims which is the proper analysis (not a comparison of the features of the two products). Defendant presents Plaintiff's commercial embodiment merely as an illustration of Defendant's position, the commercial embodiment being an example of a product which would fall within the scope of the term "sock" in the claims.

specification, figures, and representations to the Patent Office. In particular, it is an example of what the narrow claims to a sock in the '779 patent were intended to cover.

In short, as demonstrated by all the facts – facts not disputed even by Plaintiff – no reasonable juror could find that the accused product is an infant sock; especially not within the very limited scope averred by the patentee to the Patent Office during prosecution.

As such, the accused product cannot infringe as a matter of law. Nor can it be the equivalent thereof. As discussed with respect to the characteristics above, the accused product does not perform the same function as a sock or provide the same results. Indeed, an application of the doctrine of equivalents would impermissibly eliminate the term "sock" from the '779 patent claims. *See*, *Wavetronix*, 573 F.3d at 1360. It would also contradict the patent's own specification, which differentiated the patentees' product from shoes. (A41-A46 at 1:22-25).

### B. The Preamble "An Infant Sock" is a Claim Limitation

The preamble of claim 1 in the '779 patent is "An infant sock for crawling infants." (A41-A46 at A41). To avoid infringement, Piggy Pushers alleges that the preamble is not a limitation on the claims and should be ignored. Piggy Pushers' position is a very weak one.

As a matter of law, "[w]hether to treat a preamble as a limitation is a determination resolved only on review of the entire[] ... patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Poly-America, L.P., v. GSE Lining Technology, Inc.,* 383 F.3d 1303, 1309 (Fed. Cir. 2004). In general, a preamble is construed as a limitation "if it recites essential structure or steps, or it is 'necessary to give life, meaning, and vitality' to the claim. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). That the patent here was meant to be limited, and to only cover a sock, cannot reasonably be doubted.

### 1. The Patentee Only Intended to Encompass Infant Socks by the Claim

Here, just as in *Poly-America*, the language in the preamble "discloses a fundamental characteristic of the claimed invention." Poly-America, 383 F.3d at 1309. Thus, it is "is properly construed as a limitation of the claim itself." *Id; See also, Vizio, Inc. v. International Trade Commission,* 605 F.3d 1330, 1340-1341 (Fed. Cir. 2010) (preamble construed as a claim

limitation due to the fact that it was is the essence or a fundamental characteristic of the claimed invention). [6]

As in *Poly-America*, "[t]he specification is replete with references to the invention as [an infant sock], including the title of the patent itself and the "Summary of the Invention."  The phrase is used repeatedly to describe the preferred embodiments, and the entire preamble [infant sock] is restated in each of the patent's [thirteen] claims."  *Id.*[7]  In fact, an infant sock is not just the preferred embodiment, it is the only embodiment discussed in the specification.  The specification of the patent makes it very clear that the patent is directed to a sock product, and only a sock product.  The <u>only</u> way to construe the claims that comports with the patent's description, and with the patent instrument as a whole, is to define the claims as directed to socks, and not shoes.

---

[6] In addition to claim 1, every other claim of the patent (claims 2-13) similarly recites a sock.  (A41-A46 at 4:29 - 6:9).  All of the claims have language repeatedly indicating that the claims are intended to cover socks. None of the claims have any language reciting a shoe.

[7] When a term in the preamble recites a fundamental characteristic of the claimed product (as here), that term is deemed a claim limitation, i.e. a requirement of the claim.  Here the term "infant sock" recites essential structure and is "necessary to give life, meaning, and vitality" to the claim. *Poly-America,* 383 F.3d at 1310.  If the term were not construed as a limitation, the Applicant could try to overreach by asserting that each claim can, overall, cover something other than a sock (such as shoe, or a shoe having a sock part connected to it).  That would be completely contrary to the plain intent of the entire patent.

Again, to begin with, the title of the patent is "Infant Sock." Then the Abstract on the cover page of the patent explains that the patent is directed to a sock. Then the "Background of the Invention" section explicitly indicates that "[t]he present invention relates generally to a sock for an infant and, in particular, to a sock designed to provide additional traction for a crawling infant." (A41-A46 at 1:8-12).

From the outset, the specification explains the various advantages of fabric socks, such as the fact that they are aesthetically pleasing and keep the infant's feet warm. It also defines the particular problem the patent is intended to solve, namely, that socks can be disadvantageous on smooth floor surfaces because the infant may slip and fall. (A41-A46 at 1:14-22).

In fact, the patent recognizes that one solution to avoid slipping is to just dress the infant with shoes. (A41-A46 at 1:22-25). However, the patent ***rejects*** that solution since "it is not always desirable, and is often difficult, to put shoes on an ambulatory infant." (A41-A46 at 1:22-25). Indeed, after disclosing that it is undesirable and often difficult to put shoes on an ambulatory infant, the patent continues to exclusively discuss designs for a sock, and never returns to a discussion of shoes in any fashion.

In other words, the patent "teaches away" from the use of shoes and indicates that it was not meant to cover a shoe. *See e.g., In re Gurley,* 27 F.3d 551, 553 (Fed. Cir. 1994) ("A reference may be said to teach away

25

when a person of ordinary skill in the art, upon reading the reference, would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path that was taken by the applicant.")

The Background Section concludes that "[i]t is an object of the invention ... to provide *an infant sock.*"  (A41-A46 at 1:46-47)  (emphasis added).  Similarly, the "Summary of the Invention" section of the patent confirms the same.  (A41-A46 at 1:52).  In fact, that section only discusses the alleged invention in terms of it being a sock.  (A41-A46 at 1:52- 2:22).

So too, the Description of the Preferred Embodiment only uses the term sock to refer to the alleged invention, and never once uses the term shoe to refer to it.  Over and over, the patent expressly and exclusively refers to the patented product as being a sock. (A41-A46 at 2:39-41). ("Referring now to FIGS. 1 and 2, an infant sock is shown generally at 10.  The infant sock 10 includes a generally tubular sock member 11.  The sock member 11 ...").  All in all, the patent discusses the use of socks 73 times, while referring to a shoe in only one sentence.  Moreover, that sole sentence is just for the purpose of explaining why a shoe is not desirable – why the applicant is not patenting a shoe or exploring the shoe "solution."  The specification exclusively discusses the patent product in terms of socks, and specifically distinguishes itself from shoes, as it is not meant to include shoes.  This disclosure of the specification is all extremely important to coming to the

correct construction since it "makes plain what the appellants did and did not invent." *In re Fout*, 675 F.2d 297, 300 (CCPA 1982); *Phillips,* 415 F.3d at 1315.[8]

This context is important both for the terms "sock" and "sock member" and for all of the terms of the patent.  As the Supreme Court explained in Adams, "it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); *See also, Phillips,* 415 F.3d at 1316.  Indeed, as the Supreme Court explained in the *Markman* decision itself, "[a claim] term can be defined **only** in a way that comports with the instrument as a whole." *Markman*, 517 U.S. 370 at 389 (emphasis added); *Phillips,* 415 F.3d at 1316.[9]  Review of the specification makes it very clear that the '779 patent is

---

[8] *See also, SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) (construing the claims to include a "coaxial" limitation because "portions of the . . . specification lead to the inescapable conclusion that the references . . . to an inflation lumen 'separate from' the guide wire lumen must be understood as referring to coaxial lumens").

[9] As the Federal Circuit has likewise stated, "[u]ltimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips,* 415 F.3d at 1316 (internal citation omitted).

only directed to socks, and that its terms must be construed with a view to covering a sock product, not a shoe.  A shoe is not within the scope of "sock," "sock member," or in any other way within the scope of what the applicant patented.

As the district court recognized, "[n]othing in the claim language or the specifications suggest that the inventor intended 'sock' to mean anything other than what a person of ordinary skill in the art of footwear would understand it to mean."  (A304).  Indeed, as the court noted, and as discussed above, the specification of the '779 patent "*differentiates socks from shoes*." (A304) (emphasis added).

### 2. *The File Wrapper Further Confirms that the Preamble is a Limitation*

In its brief, Piggy Pushers states that "During the prosecution of the application for the '779 patent, neither the applicant nor the examiner treated the claim preamble as a limitation.  Significantly, the applicant never relied on the claim preamble to distinguish any prior art ..."  Piggy Pushers' statement is false.

In fact, in the Remarks section of an Amendment dated November 26, 2001, the applicant specifically argued to distinguish her invention over a prior art reference issue to Douglass.  She stated that "[t]he Douglass patent

fails to show or teach several limitations of the claimed invention.  The

Douglass patent is directed to bathing stockings worn by persons who can

walk and does not show **an infant sock** suitable for crawling infants as

claimed."  (A494) (emphasis added).

Thus, the applicant's own statements conclusively prove that the

"infant sock" preamble of the '779 patent must be construed as a limitation.

"Clear reliance on the preamble during prosecution to distinguish the

claimed invention from the prior art transforms the preamble into a claim

limitation because such reliance indicates use of the preamble to define, in

part, the claimed invention."  *See Catalina Mktg.*, 289 F.3d at 808.

Therefore, for the reasons set forth above, the preamble "infant sock"

is a limitation on the claim, and the Accused Product as a whole does not

infringe the asserted claims of the '779 patent.

### 3.  The Claims Must Be Limited to Their Intended Scope

In construing claims, it is "unjust to the public, as well as an evasion

of the law, to construe it in a manner different from the plain import of its

terms."  Phillips, 415 F.3d at 1312.  The plain import of Piggy Pusher's

patent confirms that all of the claims were meant to be are limited to infant

socks – i.e., none of them were meant to cover shoes (or even hybrids). The

claims of the patent were intended to be limited to socks, products which can

be worn inside shoes; the scope was not meant to extend to shoes themselves.

On the other hand, if the term were not construed as a limitation, the patentee could try to overreach by asserting that each claim can, overall, cover something other than a sock (such as shoe, or a shoe having a sock part connected to it) – as the patentee is attempting in this case. (Appellant's Brief at 4). That would be completely contrary to the plain meaning and intent of the '779 patent. The patentee only claimed to put a gripper member on a sock, and to patent such a sock. She indicated that she was distinguishing her product from shoes, and was not granted patent rights to a shoe.

Indeed, if the scope of the claims are extended to outsoles, then wearing shoes having "gripper members" on the bottom for traction has been well known for decades: it cannot be disputed that the patentee did not invent them. The many shoes and fabric sneakers with "gripper members" on their bottoms are extensive evidence of this. Likewise, even boots of this nature are available. (A508).

The patentee could not have gotten rights to the general concept of wearing a fabric portion with a gripper member on the bottom, toe, and top, since that has been long known in the prior art of shoes. As a result, the scope of every claim of the patent must be construed to strictly cover infant

sock products.  Or, put in another fashion, none of the claims extend to

Skidders' shoes.

Therefore, for the reasons set forth above, the preamble is a limitation

on the claim, and the Accused Product as a whole does not infringe the

asserted claims of the '779 patent.

### 4. *Piggy Pushers' Post-Allowance Attempt to Broaden the Claim in Litigation Would Render the Claim Invalid*

Furthermore, if the patent were construed as broadly as Plaintiff

attempts, it would be necessarily invalid over Douglass.  Douglass disclosed

a product in the form of a woven fabric with a rubber sole.  The rubber in

Douglass covers the bottom of the product, and then comes up over the toe

to cover a portion of the upper surface.  (A487- A489).  The Douglass

product can also, of course, be sized for any age person.

As such, Piggy Pushers cannot maintain that it is entitled to protection

to all woven fabrics ("sock members") having rubber on the bottom

("gripper members") coming up over the toe to the top surface.   It cannot

claim that the Skidders product infringes because it has a woven fabric and a

rubber material.  If Piggy Pushers did, its patent would be necessarily invalid

over Douglass.  Moreover, the patent certainly also can't cover a shoe with a

thick outsole.  Piggy Pushers has represented that it doesn't even cover

Douglass, which is much closer to Piggy Pushers, as Douglass discloses a stocking with a very thin sole.

### C. *Piggy Pushers Resorts to a Cannibalization of the Accused Product To Claim Infringement*

Piggy Pushers alleges that "there is no dispute that the Accused Product is a knitted or woven material that covers a foot, with rubber connected to the outside of the knitted or woven material." (Appellant's Brief at 10). It then wrongly concludes that a reasonable juror could conclude that the Accused Product is "a knitted or woven covering for the foot." (Appellant's Brief at 10). Aside from the many defects in its position discussed above, Piggy Pushers' underlying analysis is itself deeply flawed. Tellingly, Piggy Pushers' analysis is not based on the form of the product that Skidders makes and sells.

In asserting error, Piggy Pushers never discusses the intact Accused Product as a whole. Instead, it wants this Court to focus on a detached portion of the Accused Product to the exclusion of the whole marketed product. In fact, Piggy Pushers' brief does not assert that the intact Accused Product as a whole is a sock – nor can it.

At the beginning of this lawsuit, Piggy Pushers asserted a claim of patent infringement against Skidders for their use and sale of the Accused Product as a whole. But then, faced with a glaring inability to support an

infringement position during summary judgment, its expert mutilated the Accused Product into component parts in a tortured attempt to support an infringement opinion. That opinion was soundly rejected by the district court.

As the district court stated, Raymond Tonkel "removed the rubber outsole from the fabric portion of the Accused Product, and showed that the fabric portion was, without question, a sock." (A15). Yet, "by destroying the Accused Product, and separating the sock member from the outsole, Tonkel's opinion *misrepresents the manner in which the accused product is manufactured, sold and used*." (A15) (emphasis added).

Because of this incorrect analysis, "Tonkel's opinion does not create a material issue of fact for the trial as to whether the Accused Product is a sock." (A16). As such, the district court found that "[t]here is simply no evidence from which a reasonable jury could conclude that the Defendants' product is a sock." (A16).

Piggy Pushers does the same again, cannibalizing the product to make one that Skidders does not sell, and avoiding a discussion of the characteristics of the actual Accused Product as a whole. Like they did at the district court level, Piggy Pushers "raised few challenges to the opinion evidence presented in Defendant's motion concerning the nature of the Accused Product or the general characteristics of shoes and socks." (A14).

It does not take on any of the evidence of the characteristics of the product and of socks set forth above. *Supra*, Section III A.

Had Piggy Pushers even attempted a rightful analysis, they would have, like the district court did, come to one conclusion; to wit, the Accused Product has all the characteristics of a shoe, not a sock. There is the separate insole; the design for use by children in outdoor environments to guard their feet against sharp objects and rough surfaces; the configuration such that one cannot wear it within a shoe; the inability to wear one product within another; the relatively fixed interior size and shape (by molding); the thick, durable outsole; and the U.S. Customs classification. All of these factors which were not disputed, confirm that this is a shoe, not a sock product. In no way can the accused product be an infant sock, especially not within the narrow scope represented by the patentee to the Patent Office and claimed.

For these reasons, the district court was correct in its opinion of non-infringement, and it is respectfully submitted that its opinion should be upheld.

## IV.   UNLIKE THE KNOWN STRUCTURE OF A SOCK, THE ACCUSED SOCK MEMBER PORTION DOES NOT CONFORM TO THE FOOT

As a separate independent basis, summary judgment of noninfringement was also appropriate because the fabric part of the commercial accused product does not meet the claim requirement of a sock

member sized to fit the foot of an infant. Recognizing this, Piggy Pushers has again improperly doctored the product to change it from its commercial form (as noted above), so as to modify the characteristics of the 'sock member' and accuse the doctored version of infringement. *Supra,* Section II, B. However, despite Piggy Pushers' attempted manipulations, the actual commercial product does not infringe.

### A. The Claims of the '779 Patent are Limited to a Sock Member that Conforms to the Foot of an Infant Learning to Crawl

Both independent claims of the '779 patent recite the requirement of "a sock member sized to fit a foot of an infant learning to crawl". (A41-A46 at 4:14, 5:4). The District Court construed this as "a sock member of a size such that it conforms to the foot." (A307). Piggy Pushers accepts that claim construction in its brief, and does not challenge or dispute it in its opening brief.[10] (Appellant's Brief at 6). As such, that claim construction is agreed

---

[10] As Plaintiff has waived any challenge to the claim construction, Skidders shall not brief it at any length. However, it notes that the district court's construction was entirely logical. It is well known to those of skill in the art that socks are designed to fit the foot, which for a sock means that it conforms to the foot. (A345 at para. 19). Just as prior socks are known to conform to a foot, so, too, the claimed product was meant to conform to the foot. (A356- A357). It was undisputed below that socks are placed over the foot and conform to the dimensions of the foot. (A345 at para. 19). Likewise, the construction was fully consistent with the patent's specification. As the patent explained, "The upper surface 18 and the lower surface 16 preferably consist of the same amount of fabric material so as to ensure a good fit on an infant's foot." (A41- A46 at 2: 49-52). Nothing in

to herein on appeal: Piggy Pushers has waived any challenge to the claim

construction by not raising any arguments thereto in its opening brief. *U.S.*

*Philips,* 505 F.3d at 1377 (any arguments not raised in the Appellant's

opening brief are waived); *SmithKline Beecham,* 439 F.3d at 1319.

### B.    The Structure of Skidders Sock Member Cannot Infringe

Here, the accused product does not have a 'sock member' which

conforms to the foot as with a sock.

> ### 1.    *Skidders' Sock Member is Molded Into a Fixed Size and Shape*

As shown by visual inspection, the accused shoes have a rugged,

thick, durable outsole. (A349; A352-A353).



---

the patent suggests anything other than the fact that the sock member was
designed to fit an infant's foot the same as socks are known to fit the foot.

They also have an insole (see below). (A669). In addition, if the insole is temporarily taken out to internally view the shoes' construction, one can see how the thick outsole is molded to the fabric material (which Piggy Pushers calls the 'sock member') (A670).



It is undisputed that the molding here of the outsole to the 'sock member' fixedly defines the size, shape, and contour of the accused sock member (and of the whole shoe). (A349 at para. 14; A345 at para. 19). Thus, while socks are designed to conform to a child's foot, the accused sock member cannot. (A345 at para. 19). The accused sock member maintains a shape and size which is fixed in place by the thick rubber outsole it is molded to.

The accused shoes are specifically designed this way – to maintain a fixed internal configuration; this fixed space is well known in the field of shoes. (A345 at para. 20). When a child's foot is placed inside the accused product, the lower surface of the accused sock member does not conform itself to the foot – unlike a sock. (A345 at para. 19; A352- A353). Also unlike a sock, the toe surface of the accused sock member does not conform itself to the child's foot. (A345 at para. 19; A352- A353). In fact, the lower surface and toe surface ***cannot*** conform to the infant's foot. (A345 at para. 19; A352- A353). They are unable to do so because of the thick rubber sole they are molded to, which holds them in a fixed shape.

### 2. The Skidders Sock Member is Fixed in Size Larger than the Foot of the Infant

Furthermore, as noted above, the accused product accommodates an insole[11] of fixed size and shape. (A349 at para. 9; A352- A353; A346 at para. 22). The presence of an insole further demonstrates that the accused cannot meet the claim limitations.

With an insole there, the accused fabric part cannot be sized to fit an infants' foot. It must be – and is – sized <u>larger</u> than the infant's foot. This is necessary so as to fit and accommodate both the infant's foot <u>and</u> the insole.

---

[11] Ms. de Baëre testified that the accused product "has a separate outsole, bottom. . . . It has a footbed, which is an insole that's put inside separately. . . . It's a solid outsole piece with a separate footbed and a separate upper portion." (A369- A370 at 72:20-73:1).

(A346 at para. 22). It was undisputed in the district court that the accused fabric part has a fixed-in-shape and size interior designed to be larger than the infants' foot. (A345 at para. 20; A350 at para. 19; A352- A353). In fact, it is both wider and longer than the foot.

This is all the opposite of how a 'sock member' fits the foot as known in the art. It is well known that socks are designed to be slightly <u>smaller</u> than the foot of the wearer – they are designed to stretch when placed on the foot to conform thereto. (A345 at para. 20).

Since the accused shoes have an interior of fixed large shape and size, that interior cannot conform to the wearer's foot as a sock normally does. (A345 at para. 20). The size and shape of the accused fabric or 'sock member' stays the same regardless of the wearer. It maintains a fixed shape and size whether a foot (or insole) is in it or not. (A346 at para. 23). It cannot fit the foot anything like a sock does.

Indeed, for this reason, children grow out of the accused products quickly. (A350 at para. 21; A345 at para. 21). As an example, Skidders sells one shoe for a 12-month old child, and a larger shoe for an 18-month old child (A348- A349 at para. 5; A355), and a yet larger size still for a 24-month old child. (A350 at para. 20). In contrast, socks, which conform to the foot, are frequently sold for very wide ranges of children's foot sizes. For example, a single sock size is sold for children from 12-24 months.

(A350 at para. 21; A345- A346 at para. 21). The accused shoe cannot meet anywhere near this range of foot sizes. (A350 at para. 21; A345- A346 at para. 21).

Likewise, the accused product is sold in a pair: one is specifically identified for use with the right foot and one is specifically identified for the left foot. (A344- A345 at para. 17; A349 at para. 15). If the sock member fit to the foot as a sock normally does, there would be no need for the right/left designation.

Moreover, even if, *arguendo,* the accused product had a sock member that conformed to a child's foot (which it doesn't), then when the insole were placed inside that sock member, the sock member would, in fact, be conforming to the shape and size of the insole (A346 at para. 22).[12]

Removal of the insole for inspection of the interior of the product, as illustrated above, plainly confirms that the sock member cannot conform. Such removal shows that the interior of the product is molded in a fixed shape and size. (A346 at para. 23). As shown by the illustration, before a foot is put inside, the product has a large open hole to insert the foot (like a

---

[12] Furthermore, if the accused product conformed to a foot, it would be obvious from observing the outside of the product that an insole had been inserted inside the product. (A352- A353; A346 at para. 22). This is certainly not what is apparent from the outside. (A352- A353; A346 at para. 22).

shoe). This is the opposite of the closed nature of the opening for a fabric sock, and the flat nature of a sock when a foot is not in it.

All of these facts are also undisputed. All the evidence incontrovertibly establishes that the accused product does not conform to the foot of an infant learning to crawl. The accused product does not literally conform to fit a foot, nor does it perform an equivalent function,[13] as a matter of law. As was previously discussed above (*Supra,* Section IIIA), the accused product is specifically designed to perform the function of a shoe (not a sock), so it is designed to have a sock member which is entirely different from the function of conforming to a foot.

Accordingly, because the accused product does not and cannot conform to the foot of an infant learning to crawl as required by the claims, the accused product cannot infringe as a matter of law. (A346 at para. 23).

### C. *The District Court Recognized that Skidders Does Not Meet this Requirement*

After review of these factors, the district court found that Skidders did not infringe the asserted claims of the '779 patent because the Accused Product does not have "a sock member sized to fit a foot (of an infant

---

[13] As such, the doctrine of equivalents cannot be applied except as to impermissibly eliminate the term "sized to fit a foot" from the '779 patent claims. *See*, *Wavetronix*, 573 F.3d at 1360.

learning to crawl)."   (A41-A46 at 2:15, 2:56).  As demonstrated above, the district court's opinion was entirely sound.

In response, Piggy Pushers contends that the district court misapplied this claim limitation, arguing that "the claim only requires that the 'sock member' conform to the foot, rather than the Accused Product as a whole." (Appellant's Brief at 11).  In other words, it alleges that the district court required the entire Accused Product as a whole must conform to the foot in order for it to infringe this element of the claim.  That is simply incorrect.

Nowhere in its opinion does the district court engage in any analysis that supports Piggy Pushers' allegation.  As is clear from its opinion, the district court analyzed the 'sock member' of the accused product, and found that the sock member could not meet the requirements of the claim.  As the district court stated, "[t]he exterior toe surface and exterior lower surface of the sock member does not conform to the infant's foot because they are molded to a fixed shape and maintain that shape."   (A18).  Piggy Pushers' criticism is, therefore, without basis.

### D.  Piggy Pushers' Attempt to Mislead – by Doctoring the Accused Product –Should be Rejected

Well aware of the many weaknesses of its position, Piggy Pushers has resorted to doctoring Skidders' commercial product.  Only through Piggy

Pusher's improper modification of the product can Piggy misleadingly contend that the product meets the limitations of the claim.

Specifically, Piggy Pushers cannibalizes the product so that the 'sock member' portion is no longer in the fixed molded form that it has in the commercial product. Piggy Pushers then applies the claim limitations to the product it created, not the commercial product.

This is a highly irregular and completely improper infringement analysis, and should be rejected by this Court.

### 1. *Piggy Pushers' Distorts the Product for its Own Ends*

Piggy Pushers relies on the cannibalization of the Accused Product as its basis to overturn the district court's decision, and selectively misquotes the district court to make it seem as if the court agreed with its position. It misleadingly states in its brief, "The district court acknowledges that Plaintiff has shown 'that the sock member of the Accused Product when detached from the outsole or gripper member, conforms to the foot..." (A19). What Plaintiff Piggy Pushers omits is that the district flatly rejected Plaintiffs' attempted mutilation of the Accused Product.

As the district court stated: "***Tonkel had to destroy the Accused Product in order to separate the sock from the rubber sole … By taking the sock apart from the rubber sole, the expert was not considering the accused product, but a separate product, a cannibalization of the Accused***

***Product.  This is a different product than what Defendant is offering for sale***." (A19) (emphasis added).  The district court expressed its disfavor with the manipulative approach of Plaintiffs' expert – and rightly so. "Tonkel's opinion misrepresents the manner in which the Accused Product is manufactured, sold, and used.  It is not a proper comparison for infringement purposes." (A19).

Piggy Pushers tries the same approach with this Court.  But no reasonable person (whether Mr. Tonkel or anyone else) could believe that as long as one severed piece of a mutilated accused product exhibits a "sock member sized to fit a foot" as construed by the Court, then the actual accused product can fall within the scope of the patent.  Piggy Pusher's position is simply misleading.  *See e.g., Flex-Ability Concepts, LLC v. Radius Track Corp.,* 2009 U.S. Dist. LEXIS 28424 *16-18 (W.D. Okla. 2009) (summary judgment of noninfringement granted in part because plaintiff's expert cropped a photograph of the accused device to make it appear as though a claim element was present in the accused device when it was not).

The district court correctly recognized that the accused product – in its whole form, as it is made and sold – is the product which must be analyzed for infringement.  Plaintiff has no right to rip apart the product to try to get the components to meet claim limitations that the assembled product cannot

meet. "It is not proper to consider the attributes of the sock member separately from the gripper member. The patent addresses one item, a sock, that is comprised of both the sock member and the gripper member." (A19).

Simply put, because the sock member of the Accused Product is bonded to a rubber sole, no reasonable jury could find that the sock member of the Accused Product would conform to the foot in the same way that a '779 Patent "sock member" would conform to an infant's foot. While socks are designed to size and fit themselves – to conform – to an infant's foot, the Accused Products are not. (A20). The accused products are designed like shoes, not like socks. In every fashion, the sock member in the assembled commercial product is designed to have a fixed shape and size just like a shoe, and not to fit the foot like a sock.

In yet another diversion, Piggy Pushers sets forth a theoretical analysis to discuss the possibility that "even if the patent claims required the Accused Product as a whole to conform to the foot, which Plaintiff disputes, there is sufficient evidence from which a reasonable juror could infer that it conforms to the foot." But the claims don't require that the whole product fit or conform to the foot. They require that the sock member does.[14] As such, Piggy Pushers' theoretical discussion is of no moment.

---

[14] In its brief, Piggy Pushers states that "[t]he patent does not claim a sock member that is sized to fit a foot after the gripper member is connected."

For the same reasons, its expert's reliance on an American Academy of Orthopedic Surgeons ("AAOS") published article entitled "Shoes" is irrelevant. That the expert attempts to construe the term "conform" and to prove that the Accused Product as a whole "conforms" to the foot is irrelevant.[15] Brief at 16. The fitting of the whole product is not at issue in this matter. The infringement analysis is whether the alleged sock member part of the Accused Product conforms to the foot. It does not, as the district court correctly found. As such, Plaintiffs' so-called evidence is of no moment.

Moreover, the cannibalized product also cannot infringe as it itself expressly controverts the requirements of the claims. The claims require "a gripper member **connected to** said sock member." (A41- A46 at claim 1 and claim 12). Once Plaintiff cannibalized the product, the sock member was no longer connected to a gripper member (as shown in the images in Plaintiffs' brief). Thus, the cannibalized product cannot meet the "connected to" requirement of the claim since Plaintiff deliberately disconnected the two components.

---

(Appellant's Brief at 12). This statement is contrary to a straight forward reading of the pertinent claim – "a gripper member **connected** to said sock member." (A41- A46 at 4:19) (Emphasis added).

[15] Interestingly, Piggy Pushers' expert relies on an article "Shoes" to support its argument that the Accused Product infringed a patent entitled "Infant Sock." One must ask whether Piggy Pushers own expert is conceding that the Accused Product is a "shoe," and not a sock.

Plaintiff wants to look at the properties of the sock member when disconnected to try to meet the requirement to conform to the foot, while ignoring that it does not meet another requirement – that it be connected to a "gripper member."  It then wants to do the opposite:  it wants to rely on the sock member in the commercial product to meet the requirement that the sock member be connected, while now ignoring that the first requirement – that the "sock member" cannot conform to the foot, as it is molded to a fixed size and shape by the outsole.  Plaintiff can't have it both ways.

With respect to the proper form of Skidders' product, namely, as commercially made and sold, the undisputed evidence is that the product does not meet the requirement of a "sock member" that conforms to a foot.

## CONCLUSION

For all of the foregoing reasons, Skidders respectfully submits that the district court's order granting its summary judgment should be affirmed in all respects.

Dated:  June 26, 2013    By:   */s/ Morris E. Cohen*                  
Morris E. Cohen
Lee A. Goldberg
GOLDBERG COHEN LLP
1350 Avenue of Americas
4th Floor, Suite 425
646-380-2087 (telephone)
646-514-2123 (facsimile)
mcohen@goldbergcohen.com
lgoldberg@goldbergcohen.com

47

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 10,841 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word 2010 in 14 point Times New Roman.

Dated:  June 26, 2013          By:    */s/ Morris E. Cohen*
                                       Morris E. Cohen
                                       Lee A. Goldberg
                                       GOLDBERG COHEN LLP
                                       1350 Avenue of Americas
                                       4th Floor, Suite 425
                                       646-380-2087 (telephone)
                                       646-514-2123 (facsimile)
                                       mcohen@goldbergcohen.com
                                       lgoldberg@goldbergcohen.com

<u>**CERTIFICATE OF SERVICE**</u>

**13-1107,  Piggy Pushers, LLC v. Skidders Footwear, Inc.**

I hereby certify that I caused the foregoing **Brief for Defendant-Appellee** to be served on counsel for Plaintiff-Appellant via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity:

Casey L. Griffith
Texas State Bar No. 24036687
KLEMCHUK KUBASTA LLP
8150 N. Central Expressway, 10th Floor
Dallas, Texas 75206
(214) 367-6000
casey.griffith@kk-llp.com

*Attorneys for Plaintiff-Appellant*
*Piggy Pushers, LLC*

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

on this 26th day of June 2013.

/s/ William McKenzie
William McKenzie
Record Press Inc.